STATE of Minnesota, Respondent,

v.

Heardian MONTJOY, Appellant.

No. CO-83-1101.

Supreme Court of Minnesota.

April 12, 1985.

C. Paul Jones, Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert F. Carolan, Dakota Co. Atty., Mark Nathan Lystig, Asst. Co. Atty., Hastings, for respondent.

Considered and decided by the court en banc without oral argument.

AMDAHL, Chief Justice.

Defendant was found guilty by a district court jury of one count of aggravated robbery and two counts of kidnapping, Minn. Stat. §§ 609.05, 609.11, 609.245, and 609.25, subds. 1(2), 1(3), and 2(1) (1984). The trial court originally sentenced defendant to two consecutive 54-month prison terms (*i.e.,*

what was then the Guidelines equivalent of consecutive 3-year minimum terms). In imposing the consecutive 54-month terms, the court overlooked the fact that defendant had a prior conviction involving use of a firearm. Because defendant had such a prior conviction, the 5-year minimum term provision of section 609.11, subd. 5, applied rather than the 3-year provision. While this appeal was pending, the Sentencing Guidelines Commission retroactively reduced the presumptive sentence for minimum term offenses from 54 months to 36 months for 3-year minimum terms and 90 to 60 months for 5-year minimum terms. Defendant petitioned the trial court for a reduction of his two terms to 36 months each, and the state responded by arguing that the correct presumptive sentence duration for each offense was 60 months, since defendant had a prior conviction involving use of a firearm. The trial court resentenced defendant to consecutive 60-month terms. Defendant appealed that order to the Court of Appeals and obtained a reduction of the duration of each of the two terms to 54 months, the Court of Appeals reasoning (a) that the increase was improper since the state's motion to increase was untimely, and (b) that defendant was not entitled to a reduction to 36 months because if a 60-month term could have been imposed for each conviction, then clearly the imposition of 54-month terms was proper. *State v. Montjoy,* 354 N.W.2d 567 (Minn.App.1984). On this appeal from judgment of conviction, defendant, seeking a new trial, argues that he was prejudiced by (a) the omnibus court's denial of his motions to suppress eyewitness identification evidence and incriminating statements defendant made to the police, (b) the jury's learning at voir dire that a codefendant had been convicted and sentenced, (c) the prosecutor's improper opening statement and closing argument, and (d) the trial court's failure to question jurors individually about whether any of them had seen writing on the prosecutor's file indicating that defendant had a prior record. Alternatively, defendant seeks a reduction of his sentence

because (a) the trial court erroneously refused to submit a special verdict form concerning whether a gun was used in committing the robbery, and (b) the trial court's use of consecutive sentencing was unjustified. We affirm.

The prosecution was based on defendant's role in the armed robbery of Edwards Jewelry in Southview Square in West St. Paul at noon on September 30, 1982. Defendant, his girlfriend Yvonne Hendry, and defendant's friend Vincent McKinney rode with one Desco Salaam in Salaam's Cadillac from north Minneapolis to the shopping center. Defendant, Hendry and McKinney then entered the store and confronted Thomas Edwards, the owner, who was alone. Both defendant and McKinney were armed with handguns. When Edwards was uncooperative, defendant started hitting him on the head and knocked him down. Edwards then grabbed defendant's gun and fired it three times at defendant's abdomen. Fortunately for defendant, the gun was a pellet gun powered by a carbon dioxide cartridge that had lost much of its power and the pellets bounced off defendant's abdomen. As they tried to subdue Edwards, defendant told Hendry to shoot him; Edwards responded by firing the pellet gun at Hendry two times.

A customer, Shirley Maier, then entered the store and McKinney came out and ordered her to get in back and lie down. Edwards quit resisting and submitted to being tied up. McKinney, apparently having realized the police were coming, hollered, "We better get out of here." As the three ran towards the front door, carrying stolen jewelry with them, Edwards broke free, grabbed a loaded .38-caliber revolver he kept in the store, and fired it at Hendry. He then followed them out and fired again.

Once outside, defendant and Hendry ran in one direction and McKinney in another. McKinney got in Salaam's car and was stopped and arrested along with Salaam as they were driving away from the shopping center. Hendry, who was wounded in the leg, was caught in the parking lot. Defendant ran through a restaurant, out the

back door and up a hill, where he was caught hiding under a tree. Defendant's first words to the police were, "How is the girl that was shot? Is she okay?"

At 2:30 p.m. that day defendant gave a statement in which he claimed that Hendry was the only other one in the store with him and that he forced her to come along. He would not name the driver but said he had paid him $20 to drive them to the store.

A lineup was held on October 6. Five people viewed the lineup. Edwards, who was still in bad shape from the beating he received, did not identify defendant, but Maier did, as did a woman who saw defendant as he entered the store.

1. Defendant seeks a new trial on one or more of a number of grounds.

(a) First, he argues that the omnibus court erred in refusing to suppress the eyewitness identification testimony of the two women and defendant's statements to the police.

(i) Defendant claims that the lineup was impermissibly suggestive because he was the only one of the right men in the lineup with a full beard, because there was a 12-year range in the ages of the men, because the witnesses heard Edwards tell the officers before the lineup that if the man had shaved off his beard he would not be able to identify him, and because when defendant appeared Edwards said, in the hearing of the other witnesses, "That's him."

The police cannot be faulted for not having more black men with full beards. Apparently they did the best they could in selecting participants. Further, they video taped the lineup and let a public defender attend. They erred, however, in letting the witnesses view the lineup together and in not taking steps to prevent any verbal outbursts by the witnesses.

The test that we apply is whether under all the circumstances it appears that the identification procedures were so unnecessarily suggestive as to create a "very substantial likelihood of irreparable mis-

identification." *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). We conclude that the procedures did not create a very substantial likelihood of irreparable misidentification. If the lineup had been as suggestive as defendant claims it was, it is doubtful that only two of the five witnesses would have identified defendant. Significantly, not even Edwards identified defendant. The two people who did identify defendant were mature people who testified that they based their identifications of defendant—one positive, the other less than positive—on their observation of the smaller of the two male robbers, not on Edwards' exclamations or the fact that only defendant had a full beard. Further, both witnesses had an adequate opportunity to view the smaller of the two men, one before and one during the robbery. In short, it cannot be said that the identification of defendant by either of them was so unreliable that it should have been excluded completely from the jury's consideration.

(ii) Defendant bases his argument that the omnibus court erred in admitting the statements of defendant at the scene and at the station on the fact that the omnibus judge issued an order suppressing the evidence. That judge subsequently granted a timely motion by the state to reopen and to clarify the earlier order, stating that he had not intended to suppress the statement that defendant volunteered at the scene. The reopened hearing on the admissibility of defendant's confession at the station was held before a different judge, the one to whom the case was assigned for trial. He ruled that the confession was admissible.

Defendant claims that the state's only remedy was to appeal that it could not move for a reopening, and that since the state did not do that the omnibus judge had no authority to clarify his earlier order or to grant a rehearing and the trial judge had no authority to admit the confession.

In *State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977), in dismissing a pre-

trial state's appeal because the record did not demonstrate the trial court's suppression order would have a critical impact on the outcome of the trial, we stated that "the trial court is free to reconsider its rulings upon proper application of the parties at an appropriate time during the course of the trial." For a discussion of the pros and cons of granting a motion by the state to reopen *during trial, see* 3 W. LaFave, Search and Seizure § 11.2(f) (1978). *See also State v. Hamling,* 314 N.W.2d 224 (Minn.1982), and *State v. Coe,* 298 N.W.2d 770 (Minn.1980), discussing the issue of when trial judges may deviate from omnibus hearing rulings of different judges. The issue in this case is simply whether the omnibus court itself is free to entertain and grant a motion to reopen made by the state before the state's time to file a pretrial appeal has expired. It seems clear to us that at least in such a situation, the court is free to do so. On point is *People v. Wagner,* 100 Ill.App.3d 1051, 56 Ill.Dec. 580, 581, 427 N.E.2d 985, 986 (1981) (nothing in statute suggests that right of appeal is state's exclusive remedy; "public policy favors correction of errors at the trial level, and a timely motion to reconsider is an appropriate method to be utilized in directing the attention of the trial court to a claim of error"). Almost as closely on point is *State v. Wollan,* 303 N.W.2d 253 (Minn.1981), where we held that by filing a good-faith motion for clarification or rehearing within the time limit for filing a notice of appeal from a pretrial order, the state extended the appeal time period.

In this case the state probably would have prevailed on appeal if it had filed a pretrial appeal, because the omnibus judge's original ruling was a hypertechnical one suppressing defendant's confession simply because the officer in his omnibus hearing testimony just said that he read defendant a *Miranda* warning from a card but did not repeat for the record the words of the warning. Sparing everyone the time, trouble and expense of an appeal, the prosecutor took the preferable course under the circumstances and moved in a time-

ly fashion for clarification and reconsideration. We hold that this was proper.

(b) Defendant next claims that he was prejudiced by the jury's having learned that McKinney, one of defendant's accomplices, had been convicted of the offense. This happened as the panel of prospective jurors was being examined en masse. In response to a question whether any of the jurors knew any of the prospective state's witnesses, one being McKinney, a prospective juror replied that he had been present in court when McKinney was sentenced. The trial court excused the prospective juror but denied defendant's motion to excuse the entire panel. At the time jurors were being selected, it was anticipated that McKinney would testify; in fact, he never was called during the trial.

■ Relevant cases include: *State v. Helenbolt*, 334 N.W.2d 400 (Minn.1983) (holding that the defendant was not prejudiced by evidence that the state's chief witness, defendant's accomplice, had been convicted by a different jury of burglary and acquitted of felony murder, even though that tipped off the jury in the defendant's case that the other jury believed the accomplice's version, namely that defendant killed the victim intentionally), and *State v. Howard*, 324 N.W.2d 216 (Minn.1982), *cert. denied*, 459 U.S. 1172, 103 S.Ct. 818, 74 L.Ed.2d 1016 (1983) (holding that the knowledge of some members of the jury that a codefendant had already been convicted did not taint the jury). In this case the defendant has not established that he was prejudiced. Apparently the jurors were all questioned properly as to whether they could follow the court's instructions and decide the case on the basis of the evidence. The evidence clearly established that McKinney was guilty of participating in the robbery with defendant. Thus, the information that the jurors obtained at voir dire only told them what they eventually learned from the evidence, namely, that McKinney was one of the robbers.

■ (c) Defendant next argues that the prosecutor, Thomas Van Horn, committed prejudicial misconduct in his opening and closing statements. The only state-

ment by the prosecutor that bears critical examination is the following concluding statement of his closing argument:

This is an important case. It is an important case for the defendant. It is an important case for the State of Minnesota also. There are two reasons. The first reason is something that Mr. Thomas Edwards wanted to do on September 30, 1982. You know what he wanted to do? He wanted to get up that morning, have breakfast, go down to the business that's taken him a lifetime to build up, and put in an honest day's work. That's what he wanted to do. That's all he wanted to do. And, ladies and gentlemen, he wasn't able to do that that day. In fact, he went through the most terrifying day of his life and he is going to bear the physical and emotional scars of that day for the rest of his life. And there is one reason. And that is the defendant. The ringleader of this entire operation. That's why this is an important case. It is important for two other things. Two other things. These two things right here, these two guns, because let me tell you ladies and gentlemen, that when people involved are the victims of armed robberies and they are looking down the barrels of guns like those, the ends of those barrels look as big as coffee cans and there is only one thing that people looking down the wrong end of those guns can think about. And that's whether they are going to live or whether they are going to die. Right then and there. And there is nobody, I repeat, nobody that should have to go through that. That's why this is an important case. This whole trial—you stop to think about it, the whole trial boils down to one word. You know what that one word is? That's this: The word "Accountability". The word "Accountability". The rule that people who break the law have to be held accountable for their actions, because the minute they are not held accountable for the actions, is the same minute that the entire system of justice that brings us all together here in this courtroom becomes meaningless. And in line with that rule

of accountability, ladies and gentlemen, the defendant in this case has had a lot of rights. He has had the rights to an exceptional defense attorney. He has had the right to have that defense attorney cross-examine the State's witnesses extensively. The right that the State had the burden of proof beyond a reasonable doubt. The right to a presumption of innocence. The right to a jury trial of fourteen people and the right to literally hundreds of other safeguards and protections. Ladies and gentlemen, we have given Mr. Montjoy that. We have given him everything he deserves and everything he is entitled to. And in just a few minutes now, his attorney is going to stand up and I am not sure of the exact words, but I will guarantee you one thing, they are going to come out of his mouth saying one thing and that's this: "Let him go. Help the defendant avoid the consequences of his actions." And that's the very point, ladies and gentlemen, where that rule of accountability becomes very important.

In closing, I would like to say that in addition to all the rights the defendant has had in the courtroom, he has a lot of other things too. Rights outside, in the community. The right to live and work and do what he wants to, hang around with what he wants to or who he wants to. But you see, there is a point, ladies and gentlemen. There is a point where his rights end and that's the point where he gets two friends and gets all of this stuff right here, the briefcases, the bag, sunglasses, chemical, guns, ropes, and heads off to the Southview Square Shopping Center, Edward's Jewelry Store, and then, ladies and gentlemen, his rights end at the point that he takes those two hands that are tucked underneath the table right there and outside that jewelry store, takes that large pellet pistol there, puts on those sunglasses, using those same two hands, and then opens the door to that jewelry store and rushes poor Mr. Thomas Edwards. And then using those two hands, points that gun at Mr. Edwards and using those same two hands that are underneath that

table right now, starts to push him towards the rear of that store and uses those same two hands to take that rope right there and try to tie him up. And then uses the two hands that I am talking about to beat Mr. Edwards and beat him and beat him and beat him until the blood runs from his face and then as soon as his two friends have gotten the jewelry gathered up, runs out of that store. Ladies and gentlemen, that's where Mr. Montjoy's rights end and that is where your duty begins.

It is proper for a prosecutor to talk about what the victim suffers and to talk about accountability, in order to help persuade the jury not to return a verdict based on sympathy for the defendant, but the prosecutor should not emphasize accountability to such an extent as to divert the jury's attention from its true role of deciding whether the state has met its burden of proving defendant guilty beyond a reasonable doubt. It is at least arguable that the argument as to accountability crossed the line of propriety. The argument that a defendant's rights end when he commits a crime is clearly an improper argument when looked at in isolation, and ought not to have been made. *See, e.g., State v. Thomas*, 307 Minn. 229, 239 N.W.2d 455 (1976) (serious misconduct for prosecutor to argue that presumption of innocence and requirement of proof beyond a reasonable doubt are meant to protect the innocent and not to shield the guilty). However, the prosecutor himself earlier recited the various rights that defendant had and the trial court fully instructed the jury as to the state's burden of proof and the presumption of innocence. Further, the evidence of defendant's guilt was very strong. Finally, defense counsel never objected to the prosecutor's closing argument. As we stated in *State v. Brown*, 348 N.W.2d 743, 747 (Minn.1984), "a defense counsel's failure to object or to request curative instructions normally weighs heavily in our decision whether or not to reverse on the basis of prosecutorial misconduct in closing argument."

(d) Defendant's final claim of trial error relates to the trial court's failure to ques-

tion jurors individually about whether any of them was aware defendant had a prior record. At the conclusion of the prosecutor's closing argument, defense counsel met in chambers with the judge and the prosecutor and said that the prosecutor's file, which was on the counsel table during closing argument, had the words "The defendant is a repeat offender" stamped on it and that at least three of the members of the jury were in a position to see it. The judge went and visually inspected the file from the area of the jury box and said that he was not able to read the writing that was on the file from that distance. He denied the motion for a mistrial but, after discussing the matter with counsel off the record, agreed to ask the jurors if any of them saw anything on the file. Following the arguments and the giving of the instructions, the judge stated in open court:

> I am going to ask a question of the jurors at this point in time. I want to know whether or not any jurors during the course of the proceedings today, have made any observations of any writings which may have been contained on any of the files located on the counsel table. If you have made any such observations, I don't want you to tell me what you observed, but I simply want you to raise your hand at this point in time if you have done that. Have any of the jurors observed anything on any of the files which were on the tables today?

■■ Defendant argues that the trial court should have questioned each juror individually. If so, the appropriate time to do this would have been after the jury returned with the verdicts. We do not believe, however, that the trial court abused its discretion in handling the matter as it did. The fact that the judge could not see the words on the file from the jury box and the fact that no juror raised his or her hand when asked the question are strong evidence that no juror saw the printing on the file.

2. Defendant makes two arguments in support of a reduction of sentence.

(a) First, he argues that the trial court erred in refusing to submit a special verdict form concerning whether a dangerous weapon was used in the commission of the robbery. Defense counsel argues that this was necessary because the complaint charged defendant with aggravated robbery in two different ways, by use of a dangerous weapon and by inflicting bodily harm. He argues that since the court did not submit the special verdict form, one cannot be sure that defendant was found guilty of aggravated robbery on the basis of the use of a dangerous weapon and that therefore section 609.11, subd. 5, mandating longer minimum terms if firearms are used, should not be applied.

This issue has superficial similarity to one decided in *State v. Cromey*, 348 N.W.2d 759 (Minn.1984). There when the defendant was tried on counts of second-degree intentional murder and second-degree felony murder, the two offenses were both Class X offenses. The trial court, knowing that he could sentence defendant for only one of them, submitted a general verdict form and the jury found defendant guilty simply of second-degree murder. Then the Sentencing Guidelines Commission retroactively reclassified felony murder as a severity level IX offense. We reduced the sentence, saying, "Because it is not possible to tell from the general guilty verdict whether the jury found defendant guilty of intentional murder, a severity level X offense, or of felony murder, a severity level IX offense, fairness dictates that it be considered the lesser of the two." 348 N.W.2d at 760–1.

■■ As we said, the resemblance of the issue in this case to that in *Cromey* is only superficial. A defendant does not have to be convicted of an offense that has use of a firearm or dangerous weapon as an element in order for section 609.11 to apply. Section 609.11 applies to all offenses listed in subdivision 9, many of which do not have use of a dangerous weapon or a firearm as an element. Further, section 609.11, subd. 7, expressly states, "The question of whether the defendant or an accomplice, at the time of the

commission of the offense listed in subdivision 9, used a firearm or other dangerous weapon or had in possession a firearm shall be determined *by the court* at the time of a verdict or finding of guilt at trial or the entry of a plea of guilty based upon the record of the trial or the plea of guilty." Further, the conclusion is inescapable that a firearm was used in the commission of the robbery. Edwards so testified, and police found and seized two guns used by the robbers. In conclusion, defendant is not entitled to any reduction on this ground.

(b) Defendant also argues that the trial court's use of consecutive sentencing was unjustified and exaggerated the criminality of his conduct. This contention is answered by *State v. Montalvo*, 324 N.W.2d 650 (Minn.1982), and *State v. Profit*, 323 N.W.2d 34 (Minn.1982), among other cases, permitting "stacking" of mandatory prison terms in cases where consecutive sentencing is otherwise proper—*i.e.*, in cases such as this.

Affirmed.