STATE of Minnesota, Respondent,

v.

Roger Allen MORTON, Appellant.

No. A04–818.

Supreme Court of Minnesota.

Aug. 4, 2005.

Mike Hatch, State Attorney General, for respondent.

Office of MN State Public Defender, Jodie L. Carlson, Asst. State Public Defender, for appellant.

## OPINION

ANDERSON, PAUL H., Justice.

A Faribault County jury found appellant Roger Allen Morton guilty of first-degree

felony murder involving criminal sexual conduct and second-degree intentional murder. The district court convicted Morton of first-degree murder and sentenced him to life in prison. Morton appealed, arguing that (1) the district court erred by denying his post-trial motion for a *Schwartz* hearing, and (2) the state engaged in misconduct during the opening statement, Morton's cross-examination, and closing argument. After oral argument, we remanded the case to the district court for a *Schwartz* hearing. The district court conducted the hearing, and Morton subsequently withdrew his appeal on the *Schwartz* issue. The only remaining issue on appeal is whether the state engaged in misconduct. We affirm.

Around 6:00 a.m. on May 29, 2003, a guest at the AmericInn in Blue Earth, Minnesota called 911 because he was unable to locate the motel clerk. Blue Earth Police Officer Eugene Halverson responded to the call. When Halverson arrived at the motel, the guest who had called 911 let Halverson inside. Halverson searched the reception area and found keys and an electronic key card in a drawer behind the front desk. He then unlocked the door to the conference room, where he found the motel clerk, Mary Klatt, lying on the floor with her clothes partially removed. After determining that Klatt was dead, Halverson backed out of the room, closed the door, making sure that it was locked, and called for assistance.

The Blue Earth police contacted the Bureau of Criminal Apprehension (BCA) to assist in the investigation. BCA investigators theorized that, based on the position of her body and the location of her clothing, Klatt had been sexually assaulted and strangled. The BCA asked Dr. Michael McGee, the medical examiner for Ramsey and Washington Counties, to perform an autopsy. McGee confirmed the investigators' theory, noting that there were abrasions on the right side of Klatt's neck consistent with the collar of her shirt abrading the surface of her neck during manual strangulation. McGee also observed internal injuries to the muscle tissue consistent with manual strangulation. Klatt's left hand had injuries consistent with a defensive wound, and injuries to her elbow, shoulder, and head indicated that she fell to the ground. There were also injuries to her genitals, and there was semen present inside her vagina. Based on the autopsy, McGee concluded that Klatt was sexually assaulted before death and that the cause of death was asphyxia due to manual strangulation.

The motel manager told investigators that the external doors of the motel are locked at 11:00 p.m., though motel guests may use their room key cards to open a side door. Visitors who want to enter the front door when it is locked must be let in manually by someone from inside the motel. Klatt had a key to the front door on her person, and the manager had the only other key to that door.

The manager said that the overnight clerk is responsible for cleaning the pool and locking the door to the pool room by 11:00 p.m. The pool had been cleaned that night. Additionally, the overnight clerk is responsible for running a daily audit on the computer. The computer records indicate that Klatt started the audit at 2:40 a.m. on May 29, but the clock on the computer was 32 minutes slow, so it was probably 3:12 a.m. when she actually started the audit. Klatt did not finish the audit.

Because the external doors to the motel were locked when Klatt was killed, investigators initially focused their investigation on motel guests and people directly related to either Klatt or other motel staff. Investigators interviewed the employees and

guests of the motel, as well as Klatt's friends and family. The investigators learned that a nine-man construction crew from Mason City, Iowa was staying at the motel while they worked on a hospital in town. Appellant Roger Allen Morton was one of the nine construction workers.

Throughout the day on May 29, the police and BCA investigators interviewed members of the construction crew. In his interviews, Morton provided details of his activities on May 28. Morton stated that he woke up at about 5:00 a.m. and worked at the hospital until 1:00 or 1:30 p.m., whereupon he returned to the motel. At the motel, he attempted to telephone his girlfriend and made a few phone calls to other persons. Morton then went back to work later in the afternoon, and returned to the motel that evening. He said that he smoked some marijuana and then left the motel around 8:00 or 8:15 p.m. to go uptown to have some drinks and play pool. A BCA investigator asked Morton if he was trying to hook up with anybody, to which Morton responded, "if I could get lucky," and laughed. Morton stated that he stopped at a Wal–Mart, the Double Play bar, the American Legion, the VFW, and a gas station where he got something to eat.

Morton stated that he began walking back to the motel around 12:15 or 12:20 a.m. and arrived at the motel parking lot around 1:30 a.m. He leaned against a garbage can and smoked a cigarette, went to check on his construction crew's truck, and then went back into the motel. Morton told the investigator that the door to the entry area of the motel was unlocked. He said he saw no one and heard nothing while he walked to his room, where he arrived at 2:20 a.m. Morton said he then lit another cigarette as he walked into his room, which woke up his roommate, Ray Stump. He apologized to Stump, extin-guished his cigarette, and fell asleep on his cot until the other workers woke him up the next morning. The investigator asked Morton to provide a DNA sample, and Morton complied. The BCA also obtained DNA samples from the other members of the construction crew and from the clothing that Morton had worn the previous evening.

The investigators obtained records for the motel lobby telephone and learned that a call had been made from that phone at 2:59 a.m. on May 29 to an 800 number that served as an access number for prepaid Sprint calling cards. They interviewed Morton again to determine if he had any calling cards in his possession, and learned that Morton had a Sprint calling card. They obtained Morton's Sprint PIN number and subpoenaed his telephone records. Using this information, the investigators ascertained that the 2:59 a.m. call was made to a number with a 507 area code and that Morton's Sprint PIN number was used to make the call. They also determined that the 507 number belonged to Bernard Fenske. The investigators contacted Fenske, who said that he was not home at the time of the call, and the caller left a message on his answering machine. Fenske stated that the voice on the machine was that of a man, but Fenske could not understand the name of the person for whom the man was looking. Investigators subsequently learned that Morton called Fenske's telephone number while attempting to reach a woman named Tanya Croy.

In a later interview conducted for the purpose of clearing up the timeline of his telephone calls, Morton stated that he called his girlfriend, his mother, and Croy from the motel at 1:00 or 1:30 p.m. on May 28 while he was taking a break from construction work at the hospital. Morton said he used to work with Croy, and that she had given him her number to call if he

was ever in the area. Morton denied making any telephone calls from the motel lobby at 3:00 a.m. He added that friends have told him that he gets crazy and does stupid things when he drinks, but claimed that he would have to get pretty "rung up" to take someone's life.

The man who delivers newspapers to the motel testified that he was outside the motel between 2:30 and 3:00 a.m. on May 29 putting newspapers in a rack when he noticed a man leaning over the counter talking and laughing with Klatt. The newspaper delivery man estimated that the man at the counter was about six feet tall, weighed 160–170 pounds, and wore blue jeans and an unbuttoned dark khaki or green Army shirt over a white t-shirt.

Klatt's fiancé, Danny Larson, and Kevin Cox, the husband of Klatt's coworker Catherine Cox, were also considered suspects in Klatt's murder. Larson testified at trial that Klatt expressed concerns about a coworker's husband a few months before she died. Larson said that the husband would hang around the motel when Klatt was working, and Klatt said that it bothered her. Larson said that Klatt told him that the husband came out of the swimming pool on one occasion wearing only a towel and exposed himself to her. Klatt also told her best friend that Kevin Cox gave her "the creeps," that he exposed himself to her, and that he had been hanging out in the parking lot on a couple evenings when Klatt was working alone. When the police interviewed Cox on May 29, he had a motel key card in his possession. Investigators confronted Cox with a question about whether his fingerprints would be found in the conference room, and he volunteered that he had been in the bathroom of the conference room where Klatt's body was found. Cox is about 6'2" tall, weighs 220 pounds, and has a prior conviction for criminal sexual conduct involving his daughter.

Larson and Cox both provided DNA samples, but BCA testing excluded them as the source of the semen and the hairs that were found on Klatt's collar and face and near her body. Additionally, Cox's wife Catherine provided him with an alibi. She testified that she worked from 3:00 p.m. until 11:00 p.m. on May 28, and while she was working, Cox was watching television in one of the motel rooms. They both went into the conference room a few times because they were taping television shows using the VCR in the room. Klatt arrived for her shift shortly before 11:00 p.m., just before Cox and his wife left. Cox's wife said that she and Cox spent the rest of the evening watching the taped television programs before they went to bed. Cox's wife indicated that her husband did not leave the bed after they went to sleep that night because he would have had to climb over her to do so.

BCA testing revealed that the semen and one of the hairs found on Klatt's body matched Morton's DNA profile. After the DNA analysis showed a positive match with Morton, the BCA initiated a criminal complaint against him. Morton was arrested for Klatt's murder, and the Faribault County Attorney charged him with one count of intentional second-degree murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2004). A grand jury subsequently indicted Morton with one count of premeditated intentional first-degree murder in violation of Minn.Stat. § 609.185(a)(1) (2004), and one count of first-degree murder for causing death while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence in violation of Minn.Stat. § 609.185(a)(2) (2004).

Morton's jury trial began on January 27, 2004. At trial, Ray Stump, Morton's

roommate at the motel, testified that he and Morton shared a room at the AmericInn in late May 2003, with another construction worker, Shawn Rayburn. Rayburn slept in the bed by the window, Stump slept in the bed closest to the door, and Morton slept on a cot. Stump stated that on May 28, he went to bed around 11:00 or 11:30 p.m., Rayburn came in a little later, and Morton said he was going to a bar. Stump woke up twice in the middle of the night—once when Rayburn returned from his trip to Mason City, and again when Morton woke him up when he came in at about 2:00 or 2:30 a.m. Stump said he went back to sleep until 5:00 a.m. and could not say for sure whether Morton got up and left the room after 2:30 a.m. Stump also testified that he saw a man taller than six feet with long black hair who wore a green shirt and dark pants hanging around the lobby on May 28.

Morton testified that on May 28 he was working on the roof of the hospital when his crew stopped about 1:15 or 1:30 p.m. because they had caught up to another crew and needed to wait for that crew to finish its work. Morton's crew returned to the motel, and Morton tried to call his mother. Morton said that his roommates wanted to rest in their motel room, so Morton went to another room, and then tried to call his girlfriend and Croy from the phone in the motel lobby. Morton estimated that he made the calls between 1:45 and 3:15 p.m. The crew went back to work around 4:15 p.m. and finished for the day at about 5:30 p.m. Morton stopped at a liquor store on the way back to the motel, then hung out at the motel, leaving once to get cigarettes and lottery tickets. At about 8:30, Morton left the motel to check out the fairgrounds, and then stopped at Wal–Mart. Morton went back to the motel where he talked with some of the other men from his crew, drank some alcohol, and smoked some marijuana.

Morton testified that later in the evening, he walked uptown and stopped at a convenience store to buy some cigarettes, call his girlfriend, and get some food. Morton arrived at a bar called Double Play at about 11:35 p.m. There, he talked with the disc jockey about karaoke, had a drink, and played pool. Morton then left to check out some of the other bars in town, but the Legion was closed and the VFW also appeared to be closing. Morton headed back to the motel, but started to feel ill from the combination of alcohol and convenience store food, so he laid down near a bridge for about 15 minutes before returning to the motel. Morton testified that at the motel, he again felt ill. He smoked a cigarette and laid down in the back of the construction crew's truck. He said that he went inside the motel at about 1:50 a.m., and at that time the front door to the motel was unlocked. When he entered his room, both Stump and Rayburn were there. Stump mumbled something, and Morton apologized for waking him up. Morton denied having any contact with Klatt that night, denied having sexual intercourse with her, and denied killing her.

On February 5, 2004, the jury found Morton guilty of first-degree felony murder involving criminal sexual conduct in the first or second degree and second-degree intentional murder, but acquitted him of first-degree premeditated murder. The court convicted Morton of first-degree murder and sentenced him to life in prison.

After the trial, Morton's counsel learned that on the first day of jury selection, a bailiff told a potential juror that the bailiff "didn't know why they were wasting their time with the trial, since the defendant was guilty." The bailiff made this comment while the potential juror and the bailiff were standing with the rest of the potential jurors at the west end of the

hallway between the jury room and the courtroom. The potential juror who heard the bailiff's remark did not serve on Morton's jury, and he did not recall anyone else being nearby when the remark was made and did not know if anyone else heard the remark. Concerned that seated jurors might have overheard the remark or that it might have been relayed to them, Morton moved for a *Schwartz* hearing,[1] a new trial, and a change of venue. The district court denied this motion.

On direct appeal to this court, Morton argued that (1) the district court erred by denying his post-trial motion for a *Schwartz* hearing to question jurors to determine whether they overheard the bailiff's comment during jury selection, and (2) the state engaged in misconduct during the opening statement, Morton's cross-examination, and closing argument, and that the misconduct denied Morton his right to a fair trial.

We heard oral argument on March 2, 2005. After argument, we remanded the case to the district court for the limited purpose of conducting a *Schwartz* hearing to determine whether the bailiff's comment was overheard by or relayed to any of the seated jurors. The court conducted the *Schwartz* hearing on March 25 and issued its order on March 30. According to the court, the 12 jurors who rendered the verdict were sworn and individually examined at the *Schwartz* hearing using two questions agreed upon by the parties: 1) "did you hear any remarks by a bailiff stating the bailiff's belief that the Defendant was guilty?" and 2) "[d]id any other jurors or prospective jurors relay to you any remarks they heard from a bailiff concerning the Defendant's guilt?"

After questioning the jurors, the district court determined that, from the beginning of jury selection until the jury's verdict was received by the court, none of the jurors had heard or had relayed to them any remarks by the bailiff stating her belief that Morton was guilty. Of the 12 jurors, 11 testified that they heard no remarks, and one testified that she could not remember anybody saying anything. Having found these facts, the court concluded that Morton was not prejudiced.

In supplemental briefing, Morton stated that he does not dispute the district court's findings of fact and conclusions of law, and thereby withdrew the *Schwartz* issue from this court's consideration. The state acknowledged Morton's withdrawal of the *Schwartz* issue in a reply brief. We are satisfied with the district court's conclusions and Morton's withdrawal of the *Schwartz* issue, and will give no further consideration to this issue. Therefore, the only issue that remains to be decided on this appeal is whether the state committed prosecutorial misconduct.

Morton claims that the state committed prosecutorial misconduct during his trial by (1) asking "were they lying" questions during Morton's cross-

1. We have said: "[t]he exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury and the right to confront and cross-examine the source of the material." *State v. Cox*, 322 N.W.2d 555, 558 (Minn. 1982) (citing *Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966)). To address allegations of juror misconduct during the trial, we established the *Schwartz* hearing. *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 328, 104 N.W.2d 301, 303 (1960); Minn. R.Crim. P. 26.03, subd. 9. In a *Schwartz* hearing, the district court examines, in the presence of all interested parties, all jurors who may have been privy to alleged misconduct in order to determine whether and to what degree those jurors may have been prejudiced by an error committed at trial. Minn. R.Crim. P. 26.03, subd. 9.

examination, and (2) "inflam[ing] the passions and prejudices of the jury by encouraging sympathy for the victim and contempt for [the defendant]." When we review claims of prosecutorial misconduct, we will reverse only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial. *See State v. Powers,* 654 N.W.2d 667, 678 (Minn.2003). If the state has engaged in misconduct, the defendant will not be granted a new trial if the misconduct is "harmless beyond a reasonable doubt." *Ture v. State,* 681 N.W.2d 9, 19 (Minn.2004). An error is harmless beyond a reasonable doubt only if the verdict rendered was "surely unattributable to the error." *State v. DeRosier,* 695 N.W.2d 97, 106 (Minn.2005).

### A. *"Were they lying?" Questions*

■ Morton asserts that during his cross-examination, the state asked "were they lying" questions on five occasions when Morton's testimony conflicted with other witnesses' testimony and official records. In *State v. Pilot,* we established that, as a general rule, "were they lying" questions are inappropriate. *See* 595 N.W.2d 511, 518 (Minn.1999). We indicated that when this type of question is asked of a defendant whose testimony conflicts with that of a witness, the defendant is required to state whether he believes that the witness was *intentionally* perpetuating a falsehood—and such a statement constitutes an improper comment on another witness' testimony. *See id.* at 516. We noted that "were they lying" questions are perceived as unfairly giving the jury the impression that in order to acquit, it must determine that the witness whose testimony contradicts the defendants testimony is lying. *Id.*

Nevertheless, in *Pilot* we concluded that "were they lying" questions are permissi-ble when the defendant "[holds] the issue of the credibility of the state's witnesses in central focus." *Id.* at 518. In *Pilot,* the defendant argued that the state's witnesses were lying and that the evidence against him was fabricated as part of a vast conspiracy to convict him of a crime that he did not commit. *Id.* We concluded that because the state's "were they lying" questions "could well have assisted the jury in weighing Pilots own veracity and in evaluating his conspiracy theory," the use of these questions during cross-examination did not constitute error. *Id.*

Upon reviewing the facts and circumstances in the record before us, we conclude that the questions asked by the state on three of the five occasions cited by Morton do not rise to the level of prosecutorial misconduct. Specifically, when Morton's testimony was at odds with the Sprint calling card records, the motel telephone records, and the DNA evidence, the state made only a limited inquiry as to whether the evidence was *wrong.* First, the Sprint calling card records showed that a call was made on May 29 at about 3:00 a.m. from the AmericInn to a number in the 507 area code and the number belonged to Bernard Fenske. But Morton believed that this number belonged to Tanya Croy. When Morton denied attempting to call Croy at that time, the state asked him: "so the Sprint Company is wrong, their information is wrong?" Morton objected, and the state then asked: "[a]re you saying that the Sprint number was wrong?" Second, the motel telephone records showed that a call was made at 2:59 a.m. on May 29 to an 800 number that served as an access number for prepaid Sprint calling cards. Morton denied making that call, and the state asked him: "[s]o the phone records of the motel are also wrong?" The state rephrased the question after several objections were sustained and, after Morton again denied

making the call, eventually succeeded in asking: "[e]ven though it was your Sprint access number and your PIN number, is that right?" Morton objected, but the court overruled his objection. Finally, the state asked Morton: "did you hear that, that the DNA from the semen found in Ms. Klatt matches your semen, you heard that?" When Morton responded "yes," the state asked him: "[a]nd you're saying that's wrong?" Morton did not object to this question.

Because Morton objected to the state's questions regarding the telephone records, we focus our analysis of these questions on whether the district court abused its discretion in permitting the state to ask them. We have established that "[r]ulings on evidentiary matters rest within the sound discretion of the court, and we will not reverse such evidentiary rulings absent a clear abuse of discretion." *State v. Sanchez–Diaz*, 683 N.W.2d 824, 835 (Minn. 2004) (quoting *State v. Roman Nose*, 667 N.W.2d 386, 392 (Minn.2003)). We will carefully scrutinize this line of questioning because it is not difficult to envision a scenario where the repeated use of questions such as "are you saying that's wrong?" could cross the line so that the cumulative effect of the questions is essentially the same as if the state asked the more objectionable "were they lying?" questions. Here, the state asked Morton if the facts were "wrong," but did not ask him to comment on whether anyone responsible for the telephone records *intended* to perpetuate a falsehood. In other words, the state left open the possibility that the evidence could simply have been incorrect. While we do not condone the line of questioning used by the state, we conclude that, given the limited nature of the state's inquiry, the court did not abuse its discretion when it permitted the state to ask these questions.

Morton also raises similar concerns about the state's cross examination on the results of the DNA analysis. But Morton did not object at trial to these questions. If a defendant fails to object at trial to alleged prosecutorial misconduct or request curative instructions, we nevertheless may grant relief if we conclude that the state's conduct constituted plain error affecting substantial rights. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). Under the plain error standard, a defendant may obtain relief upon demonstrating that: (1) there was error, (2) that is plain, and (3) the error affected the defendant's substantial rights. *Id.* (citing *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). Only if the three prongs of this test are satisfied will we assess whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.* We will then correct the error only if the fairness, integrity, or public reputation of the judicial proceeding is seriously affected. *State v. Jones*, 678 N.W.2d 1, 18 (Minn.2004), *reh'g denied* (Minn. Mar. 11, 2004).

Using much the same analytical approach to the questions about the DNA analysis as we did with the telephone records, we conclude that, because the nature of the state's inquiry was limited, the district court did not err in permitting the state to ask these questions. Further, having reached the foregoing conclusions, it then follows that the state did not engage in misconduct when it used Morton's responses to these questions during closing argument in a manner consistent with the manner in which they were used during cross examination.

Morton makes a stronger case with respect to the questions the state asked of Morton when he contradicted the testimony of two AmericInn employees. First,

AmericInn employee Janet Spencer testified that Morton talked to her a couple of days before Klatt's death and asked her if he could camp at the fairgrounds to save his boss some money because he did not like sharing a room. Morton denied having this conversation, and the state asked him: "[s]o Janet Spencer wasn't telling the truth when she was on the stand?" Second, AmericInn employee Catherine Cox testified that Morton asked her about the motel conference room and whether it could be used to watch a race that was on television. Morton denied talking with Cox, and the state asked him: "[s]o Catherine Cox is not telling the truth?" Similarly, during closing argument, the state used Morton's responses to these questions to advance the argument that the jury would have to believe that Spencer and Catherine Cox were mistaken in order to believe Morton. Morton did not object to the state's use of "were they lying" questions regarding the testimony given by Spencer and Catherine Cox during cross examination, nor did he object during closing argument; accordingly, we review this issue using a plain error analysis.

We have previously expressed our concern with "were they lying" questions, and stated that as a general rule, they are inappropriate. *See Pilot*, 595 N.W.2d at 517. We have indicated that such questions are permitted in the circumstance when the defendant "[holds] the issue of the credibility of the state's witnesses in central focus." *Id.* Unlike the defendant in *Pilot*, Morton did not hold the credibility of Spencer or Catherine Cox in central focus. Though he contradicted their testimony, he did not state or insinuate that they were deliberately falsifying any of it. That Morton denied having committed the crime of raping and killing Klatt, or even that he denied having had these conversations with Spencer and Catherine Cox, is not enough to justify the state's use of

"were they lying" questions here because Morton did not put the witnesses' credibility at issue.

We conclude that the state provided no assistance to the jury in evaluating Morton's credibility by asking the "were they lying" questions, and in fact the questions constituted an improper request for Morton to comment on the credibility of Spencer and Catherine Cox. By asking "were they lying" questions on these occasions, the state shifted the jury's focus by creating the impression that the jury must conclude that these two witnesses were lying in order to acquit Morton. The state then emphasized this impression when it referred to Morton's answers during closing argument. Based on the foregoing analysis, we conclude that these questions constituted error, and that the error was plain.

 Our conclusion that the state's use of "were they lying" questions on the two foregoing occasions was error and that the error was plain means that we must proceed to the third prong of our plain error test, under which we assess whether the error affected Morton's substantial rights. In order to satisfy the third prong, the defendant must show that the error was prejudicial and that it affected the outcome of the case. *Griller*, 583 N.W.2d at 741. We consider this to be a heavy burden. *Id.* Error is prejudicial if there is a reasonable likelihood that the absence of the misconduct in question "would have had a significant effect on the verdict of the jury." *See id.* (citing *State v. Glidden*, 455 N.W.2d 744, 747 (Minn.1990)).

After reviewing the evidence submitted at trial, we conclude that the jury would have reached the same verdict even if the state had not asked Morton the two "were they lying" questions when his testimony contradicted that of Spencer and Cather-

ine Cox. The evidence against Morton is strong: he made several inconsistent statements to the police; the telephone records obtained from the motel and Sprint contradict Morton's testimony; and Morton's testimony as well as that of other witnesses puts him in physical proximity to the crime scene. The state's physical evidence strongly links Morton to the crime: semen and hair were found in multiple places on and around Klatt's body and the BCA's analysis shows that the DNA present in that evidence was a match to Morton's DNA. When Morton testified, he did not present any alternative explanation for how his semen and hair ended up on Klatt's body; nor did he refute the testimony of several witnesses indicating that he was awake and in the motel at the time of the murder. The foregoing evidence would lead a reasonable jury to render the same verdict. Therefore, we conclude that there was no reasonable likelihood that the jury's verdict would have been significantly affected had the state not asked the "were they lying" questions. Thus, we hold that Morton's substantial rights were not affected, and the third prong of the plain error test has not been satisfied.

### B. Inflaming Passions and Prejudices of the Jury

 The state may not seek a conviction at any price. *State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993). A "prosecutor must avoid inflaming the jury's passions and prejudices against the defendant." *State v. Porter,* 526 N.W.2d 359, 363 (Minn.1995). When credibility is a central issue, we pay special attention to statements that may inflame or prejudice the jury. *Id.* Morton contends that the state encouraged sympathy for the victim and contempt for him in multiple ways during the opening statement and closing argument, and these actions improperly inflamed the passions and prejudices of the

jury. We note that Morton did not object at trial during the opening statement or closing argument, but we nonetheless review his claims under the plain error standard to ensure that the state's conduct was not so prejudicial that Morton was denied his right to a fair trial. *See Griller,* 583 N.W.2d at 740.

 Morton first argues that the state improperly inflamed the passions and prejudices of the jury by juxtaposing Klatt's life with her sudden death. The state introduced Klatt in its opening statement as a "happy person" and, over Morton's objection, presented a photograph of Klatt in life. The state also presented photographs of Klatt's body after her death, and encouraged the jury to revisit the photographs during deliberations. Morton argues that the state's introduction of photographs and discussion of Klatt's life and death exceeded the bounds of permissible argument. The state responds by asserting that its discussion of Klatt's life and introduction of the photographs of her in life and death has been authorized by this court, because the photographs introduced were relevant to the crime and the nature and number of photographs introduced was not excessive.

 We have stated that in a homicide prosecution, the state may offer information about a victim's life, but may not use such information to attempt to influence the jury to decide the case based on passion or prejudice. *State v. Buggs,* 581 N.W.2d 329, 342 (Minn.1998). In *Buggs,* the state presented the victim as a "thoughtful, friendly, hard-working individual and the mother of a four-year old child," and showed a picture of her both before and after her death. *Id.* We concluded that this presentation did not "[go] beyond the pale of giving the victim a "spark of life,'" and that the matter-of-fact

way in which the information was presented was unlikely to inflame the jury's passions. *Id.* Additionally, we note that the admission of photographs is a matter left to the discretion of a district court. *State v. Sullivan,* 502 N.W.2d 200, 202 (Minn. 1993). Photographs are admissible if they accurately portray anything that a witness may describe in words, or the photographs are helpful as an aid to an oral description of objects and conditions, provided they are relevant to some material issue. *Id.* Such photographs are not rendered inadmissible just because they vividly depict a shocking crime or incidentally tend to arouse the passions and prejudices of the jurors. *Id.*

The introduction of photographs of Klatt in life and death, as well as the discussion of her life, are comparable to the evidence that we deemed properly within the states right to introduce in *Buggs.* Morton did not challenge the accuracy of the photographs of Klatt's body, and despite the graphic and "grisly" nature of those photographs, they were relevant to elements of the homicide crimes charged. Accordingly, we conclude that the introduction of the photographs and the state's discussion of Klatt's life did not exceed the bounds of what we have deemed permissible. Thus, because the state's conduct here did not constitute prosecutorial misconduct, we hold there was no error when the court admitted this evidence.

Morton next argues that the state improperly inflamed the jury's passions and prejudices by insinuating that Morton's motive for the crime was uncontrolled sexual desire: that Morton was looking for sex, and when he did not find it, he used force to rape and kill Klatt. While the state's argument need not be "colorless," it must be based on the evidence produced at trial, or the reasonable inferences from that evidence. *State v.*

*Gulbrandsen,* 238 Minn. 508, 511, 57 N.W.2d 419, 422 (1953). Counsel must not speculate about events occurring at the time of the killing absent a factual basis in the record. *State v. Bradford,* 618 N.W.2d 782, 799 (Minn.2000), *reh'g denied* (Minn. Oct. 25, 2000). In a first-degree murder prosecution, the state is not required to establish a motive; however, credibility is lent to the state's contention that the defendant committed the crime if the state can establish a motive for the crime. *State v. Berndt,* 392 N.W.2d 876, 879 (Minn. 1986).

Morton argues that the state improperly "went beyond arguing reasonable inferences from the evidence" in its closing argument. In support of this argument, Morton first asserts that the state was disingenuous and misleading when, based on Morton's response to a question that he was trying to "hook up," it argued that Morton "made his own luck" by raping and strangling Klatt. Morton suggests that when he supposedly said "If I could get lucky" in response to the BCA investigator's question regarding whether Morton went uptown to try to "hook up" with a woman, he indicated that he merely had a "generalized hope that he might be lucky enough to meet someone." Morton also asserts that the state improperly argued that Morton committed the murder because he was sexually frustrated, and that there is "very little evidence to suggest that [he] was avidly seeking sex on May 28." He asserts that there was "no way of knowing if [he] called Tanya Croy for the overt purpose of having sex with her, or if it was merely an unarticulated hope." He claims that his conduct that night merely suggests that he was interested in getting away from his roommates for a while and that "if he happened to meet someone, that would have been nice."

Based on a review of the record, we conclude that there was sufficient evidence from which the state could reasonably have drawn inferences that Morton was looking for sex on the night of May 28. Morton's testimony that he was upset and having difficulties with his girlfriend, as well as the evidence indicating that he was checking out the bars in town that night and finding "only guys," and that he called a female acquaintance at 3:00 a.m., was sufficient to establish that Morton may have been looking for a sexual encounter. Accordingly, we conclude the state's assertion that Morton was looking for sex did not constitute improper argument, and thus we hold there was no error.

### C. Accountability Argument

█ Finally, Morton argues that the state improperly encouraged the jury to hold Morton accountable for his conduct. The state's language at issue here reads as follows:

> the state is requesting that you find Roger Morton guilty of both counts of first degree murder. For you to tell Roger Morton that his luck has run out, that he premeditated the rape and murder of Mary Klatt and he murdered her while committing criminal sexual conduct.

We have stated that "[i]t is proper for a prosecutor to talk about what the victim suffers and to talk about accountability, in order to help persuade the jury not to return a verdict based on sympathy for the defendant." *State v. Montjoy*, 366 N.W.2d 103, 109 (Minn.1985). But we have cautioned the state not to use accountability arguments as a tactic to divert the jury's attention from its true role of deciding whether the state has met its burden of proof that the defendant is guilty beyond a reasonable doubt. *Id.*

Here, the state's comments encouraging the jury to hold Morton accountable were minimal and specific to the case at hand, consisting of a single statement in the state's closing argument that focused on Morton and the crime he was charged with committing. Such a minimal, specific appeal to the jury to hold the defendant accountable for a crime he is charged with having committed is not improper. We conclude that, under the circumstances of the case, the state did not engage in misconduct with respect to its accountability argument and thus we hold there was no error.

We have concluded that the state did not improperly inflame the passions and prejudices of the jury and did not make an improper accountability argument. The state did, however, commit misconduct with respect to two "were they lying" questions; but that misconduct was not plain error. Accordingly, we hold that Morton is not entitled to a new trial.

Affirmed.