**STATE of Minnesota, Respondent,**

v.

**Larry LEUTSCHAFT, Appellant.**

**No. A07–1844.**

Court of Appeals of Minnesota.

Jan. 13, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, MN, for respondent.

Eric L. Newmark, Birrell & Newmark, Ltd., Minneapolis, MN, for appellant.

Considered and decided by PETERSON, Presiding Judge; SHUMAKER, Judge; and STAUBER, Judge.

## OPINION

SHUMAKER, Judge.

In this appeal from his conviction of assault in the second degree and possession of a small amount of marijuana, appellant argues that the prosecutor committed misconduct sufficient to deny him his right to a fair trial by (1) impeaching his credibility through an allegation of tailoring his testimony; (2) asking "were they lying" questions; (3) eliciting and arguing irrelevant but prejudicial information; (4) impermissibly vouching for the state's main witness; and (5) injecting public-policy arguments into the state's closing argument. We affirm.

## FACTS

At approximately 8:30 a.m. on July 29, 2005, T.B. was driving her minivan northbound on Highway 65 in Anoka County. She was in the left lane in heavy traffic and was traveling five to ten miles per hour over the speed limit.

T.B. noticed in her rearview mirror a pickup truck that was "a car length distance behind" and appeared to be tailgating her. She felt that the driver of the pickup was being impatient and aggressive and appeared to want her to move into the right lane so that he could go by. Because of the heavy traffic, she was not able to change lanes.

Eventually, the pickup, driven by appellant Larry Leutschaft, passed her in the right lane. According to T.B., as Leutschaft passed, he pointed a handgun at her and then sped away. She called 911 and reported the occurrence as a "road rage" incident.

Two police officers stopped Leutschaft. One officer found a fanny pack containing a handgun on the passenger seat. The other officer removed three live rounds and two shell casings from the gun. The officers also found marijuana and drug paraphernalia in the fanny pack. They arrested Leutschaft.

The state charged Leutschaft with second-degree assault, possession of marijuana, and carrying a gun without a permit. Before the trial, the state dismissed the latter charge.

Both T.B. and Leutschaft testified at trial. T.B. testified to the facts related above. Leutschaft did not dispute the driving conduct but contended that he nev-

er pointed a gun at T.B. but rather made a pointing hand gesture so as to tell her to move over for traffic.

The jury found Leutschaft guilty on both counts. Contending that the prosecutor engaged in various types of misconduct, Leutschaft brought this appeal.

## ISSUE

Did the prosecutor commit misconduct by suggesting that appellant "tailored" his testimony; by asking "were they lying" questions; by vouching for the complainant; and by inflaming the passions and prejudices of the jury by referring to "road rage" incidents?

## ANALYSIS

Leutschaft argues that the prosecutor committed five instances of misconduct that had the effect of depriving him of a fair trial. The state takes issue with Leutschaft's characterization of the prosecutor's performance as "misconduct," which, the state argues, implies ethical violations, and suggests that we view the issue instead as one of prosecutorial "error." We agree that there is an important distinction to be made between prosecutorial misconduct and prosecutorial error. The former implies a deliberate violation of a rule or practice, or perhaps a grossly negligent transgression. The latter, on the other hand, suggests merely a mistake of some sort, a misstep of a type all trial lawyers make from time to time. Even with this valid distinction, prosecutorial error theoretically can be egregious enough to deprive a defendant of a fair trial.

 The standard for prosecutorial misconduct (which would seem equally applicable to prosecutorial error) is that "we reverse only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Swanson,* 707 N.W.2d 645, 658 (Minn.

2006). Furthermore, when, as here, there has been no objection to the alleged improprieties, we apply the plain-error standard of review. Under that standard, "there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights." *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). "An error is 'plain' if it is clear or obvious," usually because it clearly "contravenes case law, a rule, or a standard of conduct." *State v. Jones,* 753 N.W.2d 677, 686 (Minn.2008). The appellant has the burden of showing that plain error occurred. If he is able to do so, the burden shifts to the prosecution to demonstrate that the misconduct which constitutes the plain error did not prejudice the appellant's substantial rights. *State v. Ramey,* 721 N.W.2d 294, 299–300, 302 (Minn. 2006). "[E]rror affects substantial rights if there is a reasonable likelihood that the error had a significant effect on the jury's verdict." *State v. Vance,* 734 N.W.2d 650, 656 (Minn.2007).

Leutschaft alleges three types of prosecutorial misconduct during cross-examination, namely, (1) impeachment by suggesting Leutschaft tailored his testimony to that of T.B.; (2) asking "were they lying" questions; and (3) asking questions about a gun permit and illegally carrying a gun, which questions were irrelevant and prejudicial. Leutschaft also contends that the prosecutor committed misconduct during his final argument by vouching for T.B.; "inflam[ing] the jury's passion and prejudices by referring to 'road rage' incidents"; and referring to the gun permit issue.

*Tailoring and Confrontation Violation*

 T.B. testified during the state's case-in-chief and offered her version of the incident underlying the charges. On cross-examination of Leutschaft, the prosecutor asked about his presence during T.B.'s testimony:

Q. You got to listen to the testimony here of [T.B.], right?

A. Yes, I did.

Q. She didn't get to listen to yours, right?

A. I don't know that.

The implication of the prosecutor's question is obvious: Leutschaft had an opportunity to adjust his version of the incident after hearing the state's evidence, but T.B. had no similar opportunity. The inference to be drawn is that T.B. testified truthfully but Leutschaft possibly did not.

■ So-called "tailoring" occurs when a witness shapes his testimony to fit the testimony of another witness or to the opponent's version of the case. This obviously would be improper and dishonest, and surely would be fair game for attack if the evidence shows that it has occurred. But an attack without substantiation is seriously improper because it impugns the defendant's exercise of his right of confrontation, classified as a basic constitutional right. *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). The Minnesota Supreme Court has noted that "the right to be present at trial is protected by the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." *Swanson*, 707 N.W.2d at 657.

The *Swanson* court also pointed out that the exercise of the right to be present during the state's case is not evidence of a defendant's guilt. *Id.* at 658.

Considering the potential constitutional implications of a tailoring attack, the *Swanson* court fashioned the rule that "the prosecution cannot use a defendant's exercise of his right of confrontation to impeach the credibility of his testimony, at least in the absence of evidence that the defendant has tailored his testimony to fit the state's case." *Id.* at 657–58.

The state argues that there was evidence of tailoring. Leutschaft did not tell the arresting officers that T.B. was wearing sunglasses or using her cell phone on that day. And T.B. testified that she neither wore her sunglasses nor used her cell phone that day. But when Leutschaft testified, after having heard T.B.'s testimony, he said that T.B. was wearing sunglasses and was having difficulty trying to use her cell phone. This evidence would relate to T.B.'s ability to distinguish a pointed gun from a pointed finger and to the degree of attention she was paying to Leutschaft.

Although the prosecutor's brief questions on this point came dangerously close to violating the rule announced in *Swanson*, there was at least an arguable suspicion of tailoring because the facts omitted by Leutschaft in his statements to the police were significant enough that it would be reasonable to expect an arrested person to disclose them if they were true. Thus, if the questions were error, they were not plain error. For future guidance, prosecutors must adhere to the *Swanson* rule and their failure to do so surely will be in the realm of prosecutorial misconduct rather than prosecutorial error.

*"Were They Lying" Questions*

■ Leutschaft contends that the prosecutor committed misconduct by asking him to state whether he thought T.B. was lying in her allegations against him. That was the focus of two segments of the prosecutor's cross-examination.

First, this exchange occurred:

Q. So, you believe [T.B.] is lying in several respects, don't you?

A. Yes, I do.

Q. She is making it up, right? Well, you just said she was lying, didn't you?

A. I believe she is.

Later, the prosecutor continued with a similar line of questioning:

Q. She didn't know you. She didn't know you carried a gun, right?

A. No.

Q. But she apparently really believed that you had a gun that, as she described to your own investigator, was black, gray or silver in color[,] right?

A. I believe that's what his report indicated.

Q. That's what she apparently believed[,] right?

A. Apparently.

Q. Or was she lying about that?

A. I have no way of knowing that.

Because Leutschaft's defense attorney failed to object to these questions, we review their alleged impropriety under the plain-error standard. *Griller*, 583 N.W.2d at 740. Under that standard, error must be clear, or obvious, rather than merely hypothetical or debatable. *Jones*, 753 N.W.2d at 686.

Recognizing that Leutschaft's allegation is not mere evidentiary error but rather prosecutorial misconduct, we begin our analysis with two observations. First, the questioning about which Leutschaft complains was not pervasive in the prosecutor's cross-examination. Only three questions referred to "lying." Second, an argument could be made that Leutschaft and his defense counsel twice opened the door to such questions during Leutschaft's direct examination:

Q. It's been alleged that you pointed a gun at the alleged victim in this case. Did you do that?

A. That is absolutely untrue.

. . . .

Q. Again, tired, overworked, lends itself to people might believe that you were so irritable and angry or, you know, tired, wanting to get home, that you pointed a gun at [T.B.]. How would you respond to that?

A. That is absolutely untrue.

Since the only persons who had direct knowledge of the incident were T.B. and Leutschaft, Leutschaft's insistence that T.B.'s allegations were "absolutely untrue" could imply that he believed she was lying about the occurrence. Presumably that would permit the prosecutor on cross-examination to ask questions designed to confirm and clarify what precise defense Leutschaft was raising, because a claim that the sole prosecution witness was lying might well be dealt with differently from the claim that she was merely mistaken for one reason or another.

Despite the absence of pervasiveness of the questions about lying and the possibility that Leutschaft and his attorney virtually invited such questions, the phenomenon of the so-called "were they lying" questions deserves an examination because with increasing frequency it is alleged to be prosecutorial misconduct and reversible error. Because this seems to be a burgeoning issue in criminal appeals, more than a cursory analysis is warranted.[1]

It appears that a majority of the jurisdictions that have considered the issue of "were they lying" questions have found them categorically improper. *United States v. Henke*, 222 F.3d 633, 643 (9th Cir.2000); *United States v. Fernandez*, 145 F.3d 59, 64 (1st Cir.1998); *United States v. Lin*, 101 F.3d 760, 769 (D.C.Cir.1996);

---

1. From 1999 until the date of this opinion, the Minnesota appellate courts have addressed the issue of "were they lying" questions at least 31 times, with most of the cases occurring between 2006 and 2008.

*United States v. Scanio,* 900 F.2d 485, 492–93 (2d Cir.1990), *abrogated on other grounds by Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *Liggett v. People,* 135 P.3d 725, 732 (Colo.2006); *State v. Santiago,* 269 Conn. 726, 850 A.2d 199, 209–11 (2004); *State v. Singh,* 259 Conn. 693, 793 A.2d 226, 236–39 (2002); *Knowles v. State,* 632 So.2d 62, 65 (Fla.1993); *State v. Maluia,* 107 Hawai'i 20, 108 P.3d 974, 978 (2005); *People v. Riley,* 63 Ill.App.3d 176, 19 Ill.Dec. 874, 379 N.E.2d 746, 753 (1978); *State v. Graves,* 668 N.W.2d 860, 873 (Iowa 2003); *State v. Manning,* 270 Kan. 674, 19 P.3d 84, 100 (2001); *Commonwealth v. Martinez,* 431 Mass. 168, 726 N.E.2d 913, 923 (2000); *State v. Flanagan,* 111 N.M. 93, 801 P.2d 675, 679 (1990); *People v. Adams,* 148 A.D.2d 964, 539 N.Y.S.2d 200, 200 (N.Y.App.Div.1989); *People v. Montgomery,* 103 A.D.2d 622, 481 N.Y.S.2d 532, 532 (N.Y.App.Div.1984); *Burgess v. State,* 329 S.C. 88, 495 S.E.2d 445, 447 (1998); *Mason v. State,* 449 S.W.2d 47, 49 (Tex.Crim.App. 1969); *State v. Emmett,* 839 P.2d 781, 787 (Utah 1992); *State v. Casteneda–Perez,* 61 Wash.App. 354, 810 P.2d 74, 79 (1991); *Jensen v. State,* 116 P.3d 1088, 1095 (Wyo. 2005).

Although the courts in these jurisdictions have given various reasons for their holdings, the basis that is consistent among all is that such questions, and the answers thereto, are devoid of probative value. The other deficiencies those cases have identified are that such questions invade the province of the jury, are argumentative, are misleading, distort the government's burden of proof, tend to shift the burden of proof, are improper opinion evidence, invite mere speculation, constitute an unfair litigation tactic, and seek evidence beyond the witness's competence.

The minority jurisdictions have held that such questions are generally improper, but have opted to decline a bright-line prohibition in favor of case-by-case resolution through the exercise of judicial discretion. *S. Union Co. v. Sw. Gas Corp.,* 281 F.Supp.2d 1117, 1126–27 (D.Ariz.2003); *State v. Morales,* 198 Ariz. 372, 10 P.3d 630, 633 (2000); *State v. Pilot,* 595 N.W.2d 511, 518 (Minn.1999); *State v. Hart,* 303 Mont. 71, 15 P.3d 917, 924 (2000).

Minnesota is in the minority on this issue, having chosen not to adopt a blanket rule, and the first case to address the problem in detail is *Pilot.* 595 N.W.2d at 518. *Pilot* noted that "[t]he general concern about 'were they lying' questions is that asking one witness to express an opinion as to the veracity of another witness calls for improper comment on another witness's testimony, and that it is the province of the jury to determine the credibility of witnesses." *Id.* at 516 (footnote omitted). The court also acknowledged that such questions are "perceived as unfairly giving the jury the impressions that in order to acquit, they must determine that witnesses whose testimony is at odds with the testimony of the defendant are lying." *Id.*

Indicating that prior Minnesota caselaw provided "no definitive ruling" on the issue, the *Pilot* court reviewed that law and then held that, although "were they lying" questions generally have no probative value and are argumentative because they do not assist the jury, "an inflexible rule prohibiting such questions is [neither] necessary [nor] desirable." *Id.* at 518. The court said that in some situations those questions might serve to clarify a line of testimony or help evaluate credibility when a witness claims that everyone lied except him. *Id.* The rule that emerges from *Pilot* is that "were they lying" questions might be appropriate if the defense "[holds] the issue of the credibility of the state's witnesses in central focus" and the questions

might "assist[ ] the jury in weighing [the defendant's] own veracity...." *Id.*

The Minnesota Supreme Court reaffirmed the *Pilot* rule in *State v. Morton,* 701 N.W.2d 225 (Minn.2005). The court said that *Pilot* established the general rule that "were they lying" questions are improper. *Id.* at 233. But, the court explained, such "questions are permissible when the defendant '[holds] the issue of the credibility of the state's witnesses in central focus.' " *Id.* (alteration in original) (quoting *Pilot,* 595 N.W.2d at 518). In neither *Pilot* nor *Morton* does the court explain precisely when it might be said that a criminal defendant holds credibility in central focus. Since credibility is a ubiquitous issue in trials, except those without factual dispute that raise purely legal questions, it is difficult to imagine a situation when credibility in some sense is not held in central focus. More problematic is the fact that credibility is a broader concept than truthfulness versus lying. It also encompasses honest inaccuracy stemming from deficiencies in the ability or the opportunity to acquire personal knowledge of the facts; honest but faulty recall; and honest but inadequate narrative on the witness stand, which may have numerous linguistic, cultural, and cognitive influences.

As to these broader aspects of credibility, those we might classify as accuracy issues, the "were they lying" question not only misses the probative-value mark but also creates a structural unfairness by providing only two choices when others not only might exist but also might be more likely. It does not seem that the so-called "central focus" test is intended to embrace the category of accuracy issues.

The "central focus" test appears to apply when the defense *expressly* accuses opposing witnesses of falsehoods or fabrications. That was so in *Pilot,* as shown by defense counsel's closing argument when he said the state's witnesses "lied about it. They lied about it.... They lied. They lied." *Pilot,* 595 N.W.2d at 515. This theme was reflected also in the presentation of the defense through cross-examination and direct examination. *Id.* Surely, credibility in the sense of truthfulness versus lying was held in central focus in *Pilot.*

*Morton* also provides insight into the reach of the "central focus" rule. In that case, the defendant's testimony contradicted that of certain state's witnesses. He denied the crime of which he was accused and denied having certain conversations that the state's witnesses claimed he had. *Morton,* 701 N.W.2d at 231. But "he did not *state* or *insinuate* that they were deliberately falsifying any of it." *Id.* at 235 (emphasis added). The supreme court held that contradictory testimony by the defendant "is not enough to justify the state's use of 'were they lying' questions here because Morton did not put the witnesses' credibility at issue." *Id.* Of course, accuracy, that is, credibility in the broad sense, was still at issue, but the narrower type of credibility manifested as truthfulness versus lying was never expressly put at issue.

The court held that these questions constituted plain error because they "shifted the jury's focus by creating the impression that the jury must conclude that these two witnesses were lying in order to acquit Morton." *Id.*

▇ The cited cases have identified the plethora of infirmities inherent in "were they lying" questions. Perhaps the most invidious is the dilemma such questions create for the accused who must disparage prosecution witnesses with the odious accusation that they lied under oath; concede their truthfulness; or decline to state an opinion, which could be read as a concession of, or at least a desire not to

contest, opposing testimony. Because of the fundamental unfairness that can result from "were they lying" questions juxtaposed against the virtual absence of probative value they carry, such questions should rarely be allowed. Recognizing that in Minnesota there is no absolute prohibition against such questions but that they are generally improper, and that merely contradictory testimony, according to *Morton*, is not sufficient to meet the "central focus" test, trial courts should allow "were they lying" questions only when the defense expressly or by unmistakable insinuation accuses a witness of a falsehood.

The only two percipient witnesses in this case were the accuser and the accused. When Leutschaft said that T.B.'s allegations were "absolutely untrue," he appeared to hold in central focus her credibility in the narrow sense of truthfulness versus lying, and he arguably insinuated that she was fabricating aspects of the incident. That arguably opened the door to the prosecutor's right to confirm what the defense in the case was. Thus, it is reasonably debatable whether the "were they lying" questions were error, and, therefore, they were not plain error.

*Irrelevant, Prejudicial Evidence*

■ Upon his direct examination, Leutschaft traced his history of owning and using guns from his first BB gun through the loaded handgun he had in his truck during this incident. He also testified about gun safety and the rule that every gun should be treated as if it were loaded and should be "pointed in a safe direction." Leutschaft portrayed himself as an avid and prolific gun owner with technical knowledge about the operation and characteristics of firearms and ballistics.

The testimony about Leutschaft's sensitivity to gun safety was consistent with defense counsel's suggestion in his opening statement that, after listening to Leutschaft's testimony, the jury "will have to come to the conclusion that he is simply not the kind of man who would do what he is alleged to have done."

Cross-examining Leutschaft, the prosecutor attempted to portray a different kind of man:

Q. Right. So, is it your concern, your great concern, for the safety of others that led you to carry this loaded weapon with you next to you in the car without a permit in the same pack with your marijuana?

A. My concern for carrying that gun is my own safety.

Q. Not for others?

A. No.

Q. I see. I take it from all that gun safety training you've had that you realize that it's illegal to transport a gun in that fashion?

A. I believed it was legal because that gun is completely encased in that bag. I knew it was illegal to have loaded rounds in that gun; that I did know.

Q. All right. And you knew it was illegal not to have a permit?

A. I believed that as long as that gun was in that case that it could be legally transported in a vehicle.

. . . .

Q. You knew you didn't have a permit?

A. Yes, I did.

. . . .

Q. So, you needed—so you knew you needed to have a permit?

A. Yes, I did.

Q. But you didn't have one?

A. No, I didn't.

Q. You carried it anyway?

A. Yes, I did.

Leutschaft argues that, by cross-examining him about the lack of a gun permit, the prosecutor was attempting to portray him as "a person who disregards the law and rules on firearm safety, and thus was likely to have committed the crime for which he was charged."

Leutschaft attempted to bolster his defense that he did not point a gun at T.B. by offering evidence from which the jury could infer that he was not the type of person who would do such a thing. That evidence took the form of a character trait of adherence to gun safety, particularly the rule that a gun should always be pointed in a safe direction, which obviously never would be directly at another human being. This character evidence was admissible under the rules of evidence, and the prosecutor was permitted to rebut that evidence by showing a contrary character trait. Minn. R. Evid. 404(a)(1). Furthermore, the prosecutor may show specific instances of conduct in rebuttal of the character trait an accused brings out. Minn. R. Evid. 405(b); *State v. DeBaere*, 356 N.W.2d 301, 306 (Minn.1984).

The specific instance of conduct of which Leutschaft complains, and which we find problematic, is that of carrying the handgun without a permit. Our first concern is that the state initially charged Leutschaft with that crime and then dismissed the charge. At the very least, that raises a concern of the fairness of the inquiry. More significantly, the specific instance of conduct brought out on cross-examination must be relevant to the character trait the accused has offered. *United States v. Adair*, 951 F.2d 316, 319 (11th Cir.1992) (stating that specific incidents about which inquiry is made must be relevant to the character trait in issue). To be relevant, the specific instance must make the trait less likely to exist than if there were no such evidence. Minn. R. Evid. 401.

The character trait Leutschaft offered was that of safety in handling firearms. We fail to see how the absence of a gun permit, if one is required, makes it less likely that Leutschaft handled the gun in question safely by not pointing it at T.B. It has not been shown or argued that a permit or the absence thereof would have influenced Leutschaft's conduct in any way. Rather, the inquiry invites a broader inference, namely, that Leutschaft is not a law-abiding person because he failed to obtain a permit required by law. This broad attack exceeds the scope of proper rebuttal of the particular character trait Leutschaft introduced in his defense.

The prosecutor's inquiry about the lack of a gun permit was error but not likely prosecutorial misconduct. Even if it was plain error, it did not likely have "a significant effect on the jury's verdict" as required for a reversal. *Vance*, 734 N.W.2d at 656. We reach this conclusion by noting Leutschaft's candid admission on the witness stand that he knew it was illegal to carry a loaded gun in his truck. Thus, even without evidence of the lack of a gun permit, this admitted illegality and arguably dangerous conduct offset the "good character" argument.

*Misconduct in Closing Argument*

Leutschaft also alleges three instances of misconduct during the prosecutor's closing argument. First, he alleges that the prosecutor impermissibly vouched for T.B. when he argued her credibility:

> You saw [T.B.] for quite a while, observed her, listened to her, heard her sworn testimony. She's not some flaky individual. She's a responsible, mature person who works at a responsible job taking care of people, who has five children. She's not a vindictive person,

which she would have to be to be making this up, who is going to go to all and any lengths to get back at [Leutschaft] for what? Tailgating her? Telling her to move over into another lane? Do you believe that? Is that reasonable? Does that match with common sense? No, it doesn't. Quite to the contrary, [T.B.] was very honest on the stand, both on direct and cross. She did as best she could to tell you what it is she saw, and she knows what she saw.

During his rebuttal argument, the prosecutor noted defense counsel's comment on T.B.'s delay in describing the gun and then gave an explanation:

Interesting, isn't it, 22 months later comes up that [the gun is] black and silver or gray? Well, the only reasonable implication from that is that she did make it up; that someone told her or showed it to her and now she is passing that on as it's the truth.

So, that is the allegation. She's not making it up. No one told her—no one showed it to her except me the day she testified, as she testified to earlier.

■■■■ "It is improper for a prosecutor in closing argument to personally endorse the credibility of witnesses." *State v. Porter*, 526 N.W.2d 359, 364 (Minn. 1995). This rule, however, "is not designed to prevent the prosecutor from arguing that particular witnesses were or were not credible." *State v. Everett*, 472 N.W.2d 864, 870 (Minn.1991). The use of the first-person pronoun "I" indicates that the prosecutor has injected his or her personal opinion into an argument. *Ture v. State*, 681 N.W.2d 9, 20 (Minn.2004); *see also State v. Reed*, 398 N.W.2d 614, 617 (Minn.App.1986) (holding that the phrase "the state submits" does not inject the personal opinion of the prosecutor, in contrast to the phrase "I think"), *review denied* (Minn. Feb. 13, 1987).

We find no impropriety in the prosecutor's arguments. He called the jury's attention to T.B.'s testimony and suggested that it was plausible and that she testified honestly. He did not interject personal opinion or intimate that he had any particular knowledge of her truthfulness. Rather, he invited the jury to make its assessment on the basis of what it heard and saw in the courtroom.

■■■■ Leutschaft next contends that the prosecutor inflamed the jury's passions and prejudices by making a public-policy argument about road rage.

■■■■ The Minnesota Supreme Court "ha[s] held that the state should refrain from asking questions or making arguments that would divert the jury from its duty to decide a case on the evidence by injecting issues broader than a defendant's guilt or innocence into the trial." *State v. Dobbins*, 725 N.W.2d 492, 512 (Minn.2006). The state urges that the prosecutor made this argument in response to defense counsel's claim: "Why do this? He would have to be nuts." The evidence supported the characterization of this incident as "road rage" and that is how T.B. described it. Thus, the prosecutor's argument using that characterization to explain why Leutschaft would point a gun at T.B. was a proper comment. But it was improper to allude to more egregious acts that might culminate in an actual shooting. However, this was a very minor part of the prosecutor's argument and could not plausibly have caused the jury to be so inflamed as to convict Leutschaft.

Finally, Leutschaft contends that the prosecutor's argument about illegal possession of a handgun was misconduct. We have discussed above the relevancy issue regarding the lack of a gun permit. It was error to emphasize that evidence during final argument. But the prosecutor tied that aspect of his argument to some extent to the character issue of gun safety, which

was a proper issue to address. For the same reason we declined to hold that the introduction of the irrelevant specific instance of conduct was reversible error, we hold that this impropriety in the prosecutor's final argument was not reversible error.

We are unable to conclude that any particular error, or the errors cumulatively, warrant a reversal.

### DECISION

The prosecutor did not improperly suggest that appellant tailored his testimony, did not ask improper "were they lying" questions, and did not impermissibly vouch for the complaining witness. The prosecutor's reference in final argument to matters not supported by the facts was not reversible error.

**Affirmed.**