*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2318**

State of Minnesota,
Respondent,

vs.

Kenny Dewayne Cooper,
Appellant.

**Filed December 15, 2014
Affirmed
Reyes, Judge**

Hennepin County District Court
File No. 27CR1240953

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Michael W. Kunkel, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Peterson, Judge; and Reilly, Judge.

**REYES**, Judge

On appeal from his conviction of aiding and abetting first-degree aggravated robbery, appellant argues that multiple incidents of prosecutorial misconduct affected the jury's verdict and deprived him of a fair trial. We affirm.

**FACTS**

On the evening of October 6, 2012, R.V. was in the front yard of his house when he was approached by E.J., who was dressed in a light t-shirt, wore no shoes, and claimed that he had just been robbed. The police were called, and E.J. stayed at the residence of R.V. and M.V. until an officer responded. E.J. told the police that he had recently purchased a car through Craigslist from an individual named "Jay," but there was an issue with getting title transferred to E.J.'s name. E.J. told the police that he had met up with "Jay" to resolve the issue, but when he entered a vehicle occupied by "Jay" and other individuals, he was robbed at gun point. The parties disagree about the events that occurred prior to E.J. arriving at the residence of R.V. and M.V.

**I.     Cooper's Version**

Testifying on his own behalf, appellant Kenny Dewayne Cooper stated that in early August of 2012, he was driving the Cutlass with a "For Sale" sign in the window and was flagged down by E.J. The two discussed the car, and E.J. expressed a serious interest in purchasing it. Approximately a week later, E.J. called Cooper and arranged to meet at a service station to buy the car.

After test-driving the vehicle, E.J. agreed to purchase it, and Cooper called his girlfriend to meet them with the title. Cooper testified that E.J. gave Cooper only $3,000 and stated that it was all the money he had with him. The two came to an agreement where E.J. would owe Cooper the remaining $1,500 from the original sale price of $4,500, and E.J. would be allowed to take possession of the car. Cooper, however, was to retain the actual title to the car until the debt was paid. Cooper allowed E.J. to sign the title as assurance that he would acquire ownership of the car once he had paid the full amount.

By the end of September, Cooper had not received the remaining $1,500. After arguing over the phone about the money, Cooper told E.J. that he was going to report the car stolen. Cooper testified that he reported the car stolen the day after their argument. Cooper stated that he never saw E.J. again after the initial sale of the car and that he did not rob him as E.J. claimed. Cooper admitted to lying to police initially when he was arrested in connection with the robbery but explained that he did so because he was concerned about having made the false report that the car had been stolen.

At trial, Cooper's brother, K.P., testified on behalf of Cooper and corroborated his story.

## II.    E.J.'s Version

E.J. testified to the following at trial. After seeing a Craigslist posting for a 1987 Cutlass Supreme, E.J. called the number listed and spoke with a man who gave the names "Jay" and "Supa." At trial, E.J. identified this individual as Cooper. The two made arrangements to meet up and discuss E.J.'s purchase of the car. On August 28, 2012, E.J.

met Cooper at a service station and, after test driving the vehicle, E.J. agreed to purchase the car. E.J. would pay the full asking price of $4,500 but demanded to be provided the title before any payment was made. Cooper then called his girlfriend—the car's actual owner—and had her bring the title to the service station. Once he received the title, E.J. gave Cooper $4,500 in cash, and Cooper gave him the keys to the car.

E.J. went to the Department of Motor Vehicles (DMV) approximately one month later to record the transfer of title for the car. E.J. was told that because he waited too long to present the title to the DMV, he needed to get additional paperwork from the seller of the vehicle. E.J. called Cooper and made arrangements to meet with him and his girlfriend in a residential area of south Minneapolis to get their signatures on the additional documents. When he arrived, E.J. was waved over to a vehicle occupied by Cooper, Cooper's girlfriend, and Cooper's brother, and was told to get inside. Once inside, E.J. gave Cooper the actual title and supplemental paperwork that needed signing. After E.J. handed over the title, Cooper produced a handgun, pointed it at E.J.'s chest, and demanded that he take off his jewelry, shoes, and jacket. Cooper's brother reached into E.J.'s pockets and removed his wallet and cell phone. When Cooper asked E.J. to give up his car keys, E.J. ran from the car. After Cooper and the others left, E.J. went to find help. A short time later, E.J. approached R.V. and asked for help in calling the police.

The state submitted other evidence to corroborate E.J.'s testimony. R.V., M.V., and the two responding police officers all testified regarding E.J.'s story. Evidence of the subsequent investigation was provided, including a photo lineup identifying Cooper as

4

the assailant, and phone records linking Cooper to the number E.J. called to arrange the purchase of the car. The state also submitted bank statements, auto-repair receipts, and elicited testimony of an auto-repair store owner, all of which corroborated E.J.'s version of the events.

**D E C I S I O N**

Cooper advances several examples of the prosecutor committing misconduct by eliciting prejudicial evidence of fear and by making multiple misrepresentations of the state's burden of proof. Allegations of unobjected-to prosecutorial misconduct are reviewed under a modified plain-error test. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). There are three prongs to this test: (1) whether there was error; (2) whether the error was plain; and (3) whether the plain error affected the defendant's substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn 1998). If the three prongs are satisfied, this court then assesses "whether [we] should address the error to ensure the fairness and integrity of the judicial proceedings." *Griller*, 583 N.W.2d at 740. The burden of proof is on appellant to satisfy the first two prongs. *Ramey*, 721 N.W.2d at 302. An error is plain if it contravenes case law, a rule, or a standard of conduct. *Id*. Upon making this showing, the burden will shift to the state to prove that the error did not affect the defendant's substantial rights. *Id*. at 302. The third prong involves considering the strength of the evidence against the defendant, the pervasiveness of the misconduct, and whether the defendant had the opportunity or made efforts to rebut the impropriety. *State v. Hohenwald*, 815 N.W.2d 823, 835 (Minn. 2012) (quoting *State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007)).

5

**I.      Claim of Prosecutorial Misconduct by Eliciting Evidence of Fear**

Cooper contends that the only purpose behind a particular portion of the state's line of questioning was to elicit a response showing that E.J. was afraid of Cooper. Cooper claims that such prosecutorial misconduct was clearly prejudicial because it insinuated that he possessed a violent character, which is particularly improper in a case where—as here—credibility is at issue.  We disagree.

**A.      Error.**

A prosecutor may commit misconduct by attempting to elicit or by actually eliciting clearly inadmissible evidence, even if the district court does not rule on the admissibility of the evidence.  *State v. Fields*, 730 N.W.2d 777, 782 & n.1 (Minn. 2007). Relevant evidence is generally admissible.  Minn. R. Evid. 403.  Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Minn. R. Evid. 401.  "Bias, which may be induced by self-interest or by fear of testifying for any reason, is almost always relevant because it is probative of witness credibility."  *State v. McArthur*, 730 N.W.2d 44, 51 (Minn. 2007).  However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  Minn. R. Evid. 403.  As such, district courts "should be concerned that the evidence of fear is not used to create an inference that a defendant is a bad person who is likely to commit a violent crime."  *McArthur*, 730 N.W.2d at 51.

On direct examination by the state, E.J. was asked where he was employed.  E.J. replied that he would "rather not mention" the specific location.  Then, on cross-

examination, E.J. testified that he placed the title to the vehicle in a safe but again refused to answer when asked by defense counsel about the safe's location. On redirect, the prosecutor asked E.J. about his reluctance to answer these two questions:

> Q: [ E.J.], . . . I asked you where you worked; you didn't want to tell me. The defense attorney is asking you about the location of the safe; you didn't want to say. Could you tell us why you didn't want to answer those questions?
>
> A: Just concerned about with the defendant being in the room of any of my whereabouts or places that I may be going, don't want him to know at all.

Cooper argues that because E.J.'s employment and the location of the safe were both irrelevant as to whether an aggravated robbery actually occurred, the reasons why E.J. was reluctant to provide that information was also irrelevant. Therefore, Cooper maintains, the only purpose behind the prosecutor's question was to elicit a response exhibiting E.J.'s fear of Cooper.

The prosecutor did not err in asking E.J. about his reluctance to answer every question. In *McArthur*, the supreme court noted that "[e]vidence of [a witness's] fears of testifying both tend to be relevant to general witness credibility or to explain a witness's reluctance to testify or inconsistencies in a witness's story." 730 N.W.2d at 52. Here, the prosecutor's question was aimed at clarifying the incomplete portions of E.J.'s testimony rather than exposing E.J.'s fearfulness. E.J.'s testimony that he did not want to answer the previous questions in the presence of Cooper served to explain his previous reluctance during direct examination and cross-examination. Furthermore, the prosecution followed the supreme court's previous guidance and limited E.J.'s testimony

about his fear to redirect examination. *State v. Hayes*, 826 N.W.2d 799, 807 (Minn. 2013) ("[T]he best practice in most cases is to limit a witness's testimony about … fear to redirect examination."). Accordingly, the prosecutor's question did not constitute error.

## II. Claim of the Prosecutor Misrepresenting the Burden of Proof

Cooper next argues that, during the state's closing argument, the prosecutor misrepresented the burden of proof by (1) encouraging the jury to use consciousness-of-guilt evidence as a presumption of guilt and (2) stating that if the jury believed E.J.'s testimony, then Cooper must be guilty.

### A. Consciousness-of-Guilt Evidence

#### 1. Error.

In its closing argument, the prosecution told the jury the following:

> If you disbelieve the defendant, that you believe he got up there and told you a lie, which the evidence shows he did, you need to answer some questions. He backtracked. Well, yeah, I lied to police. Well, it really wasn't a lie. It was Sergeant Sanden asked the wrong questions. He couldn't keep the story straight.
>
> Well, he's the one that has a reason to lie. If he has a reason to lie, that means he's guilty because why else would he lie?

Cooper argues that the statement, "If he has a reason to lie, that means he's guilty" is an impermissible misrepresentation of the state's burden of proof. This statement, Cooper contends, suggested to the jury that Cooper's admitted dishonesty was sufficient evidence in and of itself to support a conviction. Cooper argues that such a suggestion was improper given Minnesota's stance on consciousness-of-guilt evidence.

8

Minnesota has recognized that evidence of a defendant's conduct subsequent to an offense is generally admissible. *State v. McTague*, 252 N.W. 446, 190 Minn. 449 (Minn. 1934). However, the *McTague* court specified that subsequent conduct is "a *circumstance to be considered*—not as a presumption of guilt, but as something for the jury—as suggestive of a consciousness of guilt." 252 N.W. at 448, 190 Minn. at 453 (emphasis added). While Cooper's dishonesty with the police is certainly admissible as a "circumstance to be considered" by the jury in making a credibility determination, *McTague* makes clear that such dishonesty should not burden a defendant with a "presumption of guilt." But the prosecutor's statement that "[i]f he has a reason to lie, that means he's guilty" suggests that Cooper's subsequent conduct—his dishonesty— should be sufficient to show that he is guilty. Such a statement suggests that Cooper's subsequent conduct be considered a "presumption of guilt" rather than simply a "circumstance to be considered" by the jury. Given *McTague*, the prosecutor's statement constituted an error.

### 2. Plain.

"An error is plain if it is clear and obvious at the time of appeal. An error is clear or obvious if it contravenes case law, a rule, or a standard of conduct." *State v. Little*, 851 N.W.2d 878, 884 (Minn. 2014) (quotations omitted). Here, the error was plain because it violated a recognized standard of conduct announced by *McTague*, a decision issued in 1934.

9

### 3. Substantial Rights.

Next, we determine whether the comment was prejudicial to Cooper's substantial rights. A prosecutor's attempt to shift the burden is nonprejudicial and harmless if the district court properly and thoroughly instructs the jury regarding the burden of proof. *State v. Buggs*, 581 N.W.2d 329, 341-42 (Minn. 1998). The district court here informed the jury of the state's burden and gave a proper definition of reasonable doubt. The jury was also instructed that statements by attorneys are not evidence. Furthermore, the statement that "[i]f he has a reason to lie, that means he's guilty" was the only improper consciousness-of-guilt argument the prosecutor made. Because "courts must look at the closing argument as a whole, rather than just selective phrases or remarks that may be taken out of context," the prosecutor's statement did not impair Cooper's substantial rights. *State v. McDaniel*, 777 N.W.2d 739, 751 (Minn. 2010) (quotation omitted).

### B. Prosecutor's Arguments that Belief in the Victim Necessitates Finding of Cooper's Guilt

### 1. Error.

Cooper argues that the prosecutor misrepresented the state's burden of proof when he made several arguments to the jury, all of which were some variation of "if you believe when [E.J.] got up in here and told you his testimony, if you believe that is true, [Cooper] is guilty." The prosecutor made this type of argument in three other instances

during his closing argument.[1] Cooper concedes that while a single credible witness may be *sufficient*—on review—to support a jury's finding of guilt beyond a reasonable doubt, Cooper argues that Minnesota law does not permit juries to be told that the state has *necessarily* met its burden of proof simply if the jury believes a particular witness's testimony.

Minnesota law supports Cooper's interpretation. Cooper rightly points out that the phrase, "If E.J. is telling the truth, then Cooper is guilty" necessarily implies the phrase, "If Cooper is not guilty, then E.J. is not telling the truth." But the jury does not need to find E.J. untruthful in order to acquit Cooper. The supreme court has previously noted the dangers inherent in such an argument when analyzing the validity of "were they lying" questions. *See generally State v. Pilot*, 595 N.W.2d 511 (Minn. 1999). The court acknowledged that such questions are "perceived as unfairly giving the jury the impressions that in order to acquit, they must determine that witnesses whose testimony is at odds with the testimony of the defendant are lying." *Id.* at 516.

The dangers inherent in "were they lying" questions are similarly present in the prosecutor's "If E.J. is telling the truth, then Cooper is guilty" argument. As this court stated in *State v. Leutschaft*, "credibility is a broader concept than truthfulness versus lying." 759 N.W.2d 414, 422 (Minn. App. 2009), *review denied* (Minn. Mar. 17, 2009)

---

[1] At various points, the prosecutor argued: "No different than in a domestic assault. If you are sitting here and a wife comes in and says her husband hit her, and you believe her, that is all the evidence you need to find that husband guilty." . . . "If you believe [E.J.], as I said, the defendant is guilty." . . . "If you believe he was honest with you, there's no reason not to, and the defendant has been proven guilty beyond a reasonable doubt."

("[Credibility] encompasses honest inaccuracy stemming from deficiencies in the ability or the opportunity to acquire personal knowledge of the facts; honest but faulty recall; and honest but inadequate narrative on the witness stand, which may have numerous linguistic, cultural, and cognitive influences."). The prosecutor's argument creates a "structural unfairness by providing only two choices when others not only might exist but also might be more likely." *Id*. Simply put, the jury did not need to first find that E.J. was lying in order to acquit Cooper. *State v. Morton*, 701 N.W.2d 225, 235 (Minn. 2005) (holding that the use of "were they lying" questions was improper because "the state shifted the jury's focus by creating the impression that the jury must conclude that these two witnesses were lying in order to acquit Morton"). Thus, these types of arguments were made in error.

### 2. Plain.

As the previous analysis illustrates, the law on "were they lying" was well settled at the time of Cooper's trial and appeal. Accordingly, the error was plain. *Little*, 851 N.W.2d at 884.

### 3. Substantial Rights.

Because Cooper has established plain error, the burden shifts to the state to show that the error did not affect Cooper's substantial rights. *State v. Carridine*, 812 N.W.2d 130, 146 (Minn. 2012). However, the state's brief lacks any discussion on the effect of the potential errors on Cooper's substantial rights. The issue is now whether the state's failure to brief the issue should result in a waiver of any argument that the plain error did not affect Cooper's substantial rights.

When prosecutorial misconduct is alleged, the burden of persuasion falls squarely on the state to show that any misconduct did not affect Cooper's substantial rights. *Ramey*, 721 N.W.2d at 300 ("We conclude that prosecutorial misconduct is the type of trial error that justifies a shift in the burden for determining whether the plain error affected the defendant's substantial rights."). The decision to employ a modified plain-error analysis for instances of prosecutorial misconduct—as opposed to the traditional plain-error analysis in which the burden of persuasion is placed upon the defendant for all three prongs—is motivated by the "affirmative obligation [of prosecutors] to ensure that a defendant receives a fair trial, no matter how strong the evidence of guilt." *Id.* Moreover, in *State v. Porte* this court considered whether the state waived a harmless-error argument by failing to assert it in its responsive brief and we concluded that the state's failure to raise the argument did constitute a waiver of the issue and reversed and remanded for a new trial. 832 N.W.2d 303, 312-14 (Minn. App. 2013). Notably, *Porte* involved an objected-to error in which the *defendant* bore the burden to show that the error was not harmless. The matter at hand involves unobjected-to prosecutorial misconduct, meaning the *state* has the burden of showing that the error was harmless. *Ramey*, 721 N.W.2d at 302. Despite its clear burden of persuasion, the state did not brief this issue at all. As such, the state waived any argument that the error did not affect Cooper's substantial rights.

### 4. Fairness and Integrity of Judicial Proceedings.

Because all three prongs of the plain-error test have been satisfied, we must next address whether a reversal is required "to ensure the fairness and integrity of the judicial

13

proceedings." *Hill*, 801 N.W.2d at 654. A reversal is not required to preserve the integrity of judicial proceedings if granting a defendant a new trial would be an "exercise in futility." *Griller*, 583 N.W.2d at 742.

Although it was improper for the prosecutor to argue that believing E.J.'s testimony necessitates a guilty verdict, it is unlikely that such an argument affected the outcome. *Davis*, 735 N.W.2d at 682. The supreme court's reasoning in *Griller* informs our analysis in the current matter. In *Griller*, the court concluded that granting a new trial would be a "miscarriage of justice" because "Griller was afforded a complete adversarial trial that lasted eight days. During his trial, Griller thoroughly presented his self-defense theory of the case. The jury considered and rejected Griller's far-fetched version of events." *Griller*, 583 N.W.2d at 742. The same can be said here—Cooper was afforded a complete adversarial trial, Cooper presented his theory of the case, and the jury considered and rejected Cooper's version of the events. The jury's decision to find E.J.'s version more credible is supported by the additional evidence presented by the state, including testimony and exhibits which corroborated E.J.'s version of the events. As was the conclusion in *Griller*, granting a new trial under these circumstances "would be an exercise in futility and a waste of judicial resources." *Id*. Therefore, a reversal is not warranted.

**Affirmed.**

14